**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

TALBIRD REEVE SAMS

*Plaintiff*,

v.

PINNACLE TREATMENT CENTERS, INC., JOHN DOES (1-10) (said names being fictitious individuals) and ABC-XYZ CORPORATIONS (said names being fictitious business entities), Individually, Jointly and Severally,

*Defendants*.

Case No. 1:18-CV-09610-JHR-AMD

**Opinion**

This case comes before the Court on Plaintiff's Motion for Summary Judgment as to Counts V (unjust enrichment), VI (quantum meruit), and VII (breach of contract) [Dkt. No. 48]; Defendant's Response and Cross-Motion for Summary Judgment as to Counts V, VI, and VII of the complaint [Dkt. 56]; and Plaintiff's Reply to Defendant's Response and Cross Motion. [Dkt. No. 57]. The Court has considered the parties' written submissions and, for the reasons stated below, the Court will deny both motions as to Count VII (breach of contract), and grant Defendant's motion as to Count V (unjust enrichment) and Count VI (quantum meruit).

## I. Background

Defendant Pinnacle Treatment Centers ("Pinnacle") provides substance abuse and addiction treatment services through its in-patient and out-patient clinics nationwide. [Def's SUMF, Dkt. 56-2 ¶ 1]; *see also* Pinnacle Treatment Centers, https://pinnacletreatment.com/ (last visited Jan. 20, 2021). On or around February 18, 2014, Joseph Pritchard, Chief Executive

Officer for Pinnacle, sent a letter to Plaintiff Talbird Reeve Sams ("Plaintiff") which offered Plaintiff employment at Pinnacle as an "OTP Developer" (the "Offer Letter"). [Dkt. 48, Exh. A].

The Offer Letter contained a section titled "Employment is At Will" which stated that Plaintiff would be an at-will employee and that Pinnacle "has the right to terminate [Plaintiff's] employment with or without reason at any time." [Dkt. 48, Exh. A]. This section further stated that

> [n]either this letter nor any communication, either written or oral, should be construed as a contract of employment, unless it's signed by both you and a principal of Pinnacle Treatment Centers and such agreement is expressly acknowledged as an employment contract. Similarly, the compensation and benefits, including salary, commission plans, bonus plans, etc., are subject to the sole discretion of Pinnacle Treatment Centers and may be changed at any time.

[Dkt. 48, Exh. A]. Plaintiff signed the Offer Letter on February 24, 2014 and began working for Pinnacle on or around March 3, 2014. [Def's Resp. to Pl's SUMF, Dkt. 55 ¶ 4].

**a. Plaintiff's Job Responsibilities**

While the Offer Letter did not describe Plaintiff's responsibilities as an "OTP Developer," the Parties agree that Plaintiff was responsible for identifying locations within certain assigned states where substance abuse treatment was unavailable, gathering data on substance abuse in those locations, and proposing sites for new Pinnacle clinics. [Def's SUMF, Dkt. 56-2 ¶¶ 10–11]. After this initial analysis, Plaintiff scouted specific towns and properties for new clinics, helped to negotiate leases, solicited contractor bids for construction work, and coordinated with security companies to ensure that the clinics complied with Drug Enforcement Agency security standards. [Def's SUMF, Dkt. 56-2 ¶ 12].

The parties disagree, however, as to when Plaintiff completed his required work for each clinic. According to Plaintiff, his responsibilities ended as soon as each clinic obtained a

certificate of occupancy. [Pl's SUMF, Dkt. 48-11 ¶ 18–19]. From there, "the development steps out of it. I'm charged with getting the C of O taking it to that point. That means it's ready to open. And the operation team comes into the clinic and does everything from that point." [Def's SUMF, Dkt. 48-11 ¶ 18]. Defendant disagrees with Plaintiff's characterization of as to when his responsibilities ended, and maintains that the Offer Letter required Plaintiff to "open" Pinnacle facilities. [Def's SUMF, Dkt. 56-2 ¶ 3 n.1].

**b. Plaintiff's Compensation Scheme**

The Offer Letter established a two-tier compensation plan, whereby Plaintiff would receive a $60,000 annual base salary, and performance-based incentive bonuses. The Offer Letter described the "Incentive Plan" as follows:

> You will be entitled to earn an incentive for opening an OTP clinic and meeting the 100 initial client enrollment. The total incentive you can earn is $75,000 per clinic you open. Fifty percent (50%) or $37,500 of the incentive will be given upon opening of the clinic and fifty percent (50%) or $37,500 will be due once the clinic reaches 100 clients. The incentive must be approved by CEO and will be processed on the next pay period after approval is given.

[Dkt. 48, Exh. A]. (For clarity, and when necessary, the Court refers to these incentives separately as the "Opening Incentive" and the "Enrollment Incentive"). The Offer Letter does not define "opening" or "open" for the purposes of this Incentive Plan, or state that a clinic "opens" when a certificate of occupancy issues. The Offer Letter also does not list or explain the tasks required to "open" a Pinnacle facility. Nor does the Offer Letter indicate whether Plaintiff would be eligible for payment under the Incentive Plan—or whether Defendant would be required to pay these cash incentives—if a clinic "opened" or enlisted one hundred clients after Plaintiff no longer worked at Pinnacle.

Plaintiff's compensation plan changed twice during his tenure with Pinnacle. In January 2015, Plaintiff's base salary increased to $100,000, but his incentive bonuses reduced to $12,500 "upon opening" of each new clinic and $12,500 "at 100 census," for a possible incentive bonus of $25,000 per clinic (the "Second Incentive Plan"). [Def's SUMF, Dkt. 56-2 at ¶ 7; Pl's SUMF, Dkt. 48-11 at ¶¶ 6–10.].[1] In January 2017, Plaintiff's base salary increased to $110,000. [Pl's SUMF, Dkt. 48-11 ¶¶ 11–13]. The email documenting the 2017 salary increase did not mention the Second Incentive Plan. [Dkt. 48, Exh. C].

**c. Job Performance and Incentive Payments**

Plaintiff worked at Pinnacle From 2014 until October 16, 2017 without complaint and received his salary throughout his tenure. [*See* Def's SUMF, Dkt. 56-2 ¶¶ 1–9]. The parties do not dispute that Pinnacle paid Plaintiff his salary in accordance with the initial Offer Letter, and the 2015 and 2017 salary adjustments. Plaintiff also received payments from Pinnacle in 2015, 2016, and 2017 in amounts that are consistent with the Incentive Plan and the Second Incentive Plan. [*See* Pl's Decl., Dkt. 57 ¶ 12 and Exh. A thereto]. In a sworn declaration, Plaintiff stated that he received these incentive payments for work done on five clinics not at issue here. [Pl's Decl., Dkt. 57 ¶ 12].[2]

Beyond those five clinics, Plaintiff helped to secure certificates of occupancy for seven Pinnacle clinics (collectively the "Seven Clinics") at the heart of this case. These clinics are located in (1) Clovedale, OH; (2) Dayton, OH; (3) Chillicothe, OH; (4) Youngstown, OH; (5)

[1] In the email documenting this change in compensation, Plaintiff stated "Just to Clarify… Ann Arbor and Sterling Heights Bonus to be paid according to existing employemt [sic] offer." Scott Cohen, Associate Vice President of Finance at Pinnacle, responded "Confirmed." [Dkt. 48, Exh. B].

[2] Two of the clinics identified in this declaration, Ann Arbor and Sterling Heights, are mentioned in the January 2015 email which established the Second Incentive Plan. Consistent with this January 2015 email, *see* Note 1, *supra*, and the terms of the Incentive Plan, Plaintiff has declared that he received two $37,500 payments in connection with the Ann Arbor clinic, and one $37,500 payment in connection with the St. Clair clinic. [Pl's Decl., Dkt. 57 at ¶ 12]

Akron, OH; (6) Charleroi, PA; and (7) Vineland, NJ. [Pl's SUMF, Dkt. 48-11 ¶ 15; Def's SUMF, Dkt. 56-2 ¶ 21]; *see also* [Dkt. 48, Exh. E]. It is undisputed that certificates of occupancy issued for each of these clinics while Plaintiff worked at Pinnacle.

On or around October 16, 2017, Pinnacle terminated Plaintiff's employment. [Def's SUMF, Dkt. 56-2 ¶ 9**].** At that time, none of the Seven Clinics had formally opened for client use. [Dkt. 48 at Exh. E]. Each of the Seven Clinics eventually opened[3] and enrolled one hundred clients. [Dkt. 48 at Exh. E]. Plaintiff never received payments pursuant to the Incentive Plan or the Second Incentive Plan for the Seven Clinics. [Def's SUMF, Dkt. 56-2 ¶ 26].

### d. Procedural History

On May 23, 2018, Plaintiff filed a complaint against Defendant in this Court, alleging claims for unlawful termination under the New Jersey Law Against Discrimination ("NJLAD") (Count I); common law fraud (Count II); equitable fraud (Count III); fraud in the inducement (Count IV); unjust enrichment (Count V); quantum meruit (Count VI); breach of contract (Count VII); and breach of covenant of good faith and fair dealing (Count VIII). [Dkt. 1]. After discovery, Plaintiff filed this Motion for Summary Judgment as to his unjust enrichment, quantum meruit, and breach of contract claims (Counts V, VI, and VII, respectively). [Dkt. No. 48]. Defendant responded to Plaintiff's motion and cross-moved for summary judgment on the same claims. [Dkt. 56].

## II. Summary Judgment Standard

[3] Exhibit E to Plaintiff's motion includes a chart—provided to Plaintiff by Defendant in discovery—showing the dates when six of the Seven Clinics opened and reached one hundred clients. The only clinic absent from this chart is the clinic located in Vineland, NJ. Plaintiff's SUMF states that each of the seven facilities opened and attained one hundred clients, [Dkt. 48-11 ¶ 24], and, separately that the Vineland facility opened. [*Id.* ¶ 22]. Defendant challenges the evidentiary basis for Plaintiff's assertion, [Def's Resp. to Pl's SUMF, Dkt. 55 ¶¶ 22, 24], but affirmatively states in its brief that the Vineland clinic opened in April 2019. [Dkt. 56-1 at 10].

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Pearson v. Component Tech. Corp*., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Andersen*, 477 U.S. at 256-57. Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the finder of fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. Analysis

Plaintiff acknowledges that his unjust enrichment and quantum meruit claims cannot survive if the Court determines that a contract existed between the parties. [Pl's Mot. Summ. J., Dkt. 48-1 at 16–17]; *see also Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, No. CIV.A. 11-1279 MLC, 2011 WL 3022243, at *8 (D.N.J. July 22, 2011) ("Recovery for unjust enrichment … is an equitable remedy that is only available when there is no express contract providing for remuneration." (citing *Caputo v. Nice–Pak Prods.*, 693 A.2d 494 (N.J. Super. Ct. App. Div. 1997))); *New York-Connecticut Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 159 A.3d 892, 901 (N.J. Super Ct. App. Div. 2017) ("'[T]he existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit.'" (quoting *Kas Oriental Rugs v. Ellman*, 926 A.2d 387 (N.J. Super. Ct. App. Div. 2007))). The Court therefore reviews Plaintiff's contract claim first to determine whether an express contract existed between the parties.

### a. Breach of Contract (Count VII)

In his Motion for Summary Judgment, Plaintiff argues that he had a valid employment contract with Pinnacle, which Pinnacle breached by refusing to pay incentive bonuses for his work on the Seven Clinics pursuant to the Second Incentive Plan. [Pl's Mot. Summ. J, Dkt. 48 at 13–15]. In Defendant's Cross-Motion, Defendant argues that Plaintiff cannot recover on a contract theory because no enforceable contract existed between the parties that required Defendant to pay incentive bonuses to Plaintiff. [Def's Mot. Summ. J., Dkt. 56-1]. Defendant further argues that, if an enforceable contract existed, Defendant did not breach the contract by refusing to pay incentive bonuses because Plaintiff did not perform according to the terms of the contract. Specifically, Defendant argues none of the Seven Clinics opened for client use or attained one hundred clients until after Plaintiff was terminated and, therefore, Plaintiff did not "open" the clinics as the contract required. [*Id.* at 4–9].

For the reasons discussed below, the Court finds that an enforceable contract existed between the parties, but that the contract is ambiguous as to the Incentive Plan and Second Incentive Plan. The Court therefore denies both parties' Motion for Summary Judgment as to Count VII.

**i. An Express Contract Existed Between the Parties**

The first step in this breach of contract analysis is to determine whether a contract existed between Plaintiff and Pinnacle. *See Red Roof Franchising, LLC v. AA Hosp. Northshore, LLC*, 877 F. Supp. 2d 140, 148 (D.N.J. 2012), *aff'd sub nom. Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685 (3d Cir. 2014), *and aff'd sub nom. Red Roof Franchising, LLC v. Patel*, 564 F. App'x 685 (3d Cir. 2014) (citing *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007)). A contract "arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty …

Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (citations and quotations omitted). In the employment context, "'compensation … is an essential term of any contract.'" *Brown & Brown, Inc. v. Cola*, No. CIV.A. 10-3898, 2010 WL 5258067, at *8 (E.D. Pa. Dec. 22, 2010) (quoting *MDC Inv. Prop., L.L.C. v. Marando*, 44 F. Supp. 2d 693, 698–99 (D.N.J. 1999)). "Contracts are 'express' when the parties state their terms." *Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004)

The undisputed evidence demonstrates that the Offer Letter established a valid express contract between the parties. Joseph Pritchard, CEO of Pinnacle, sent an offer letter to Plaintiff on February 18, 2014. [Dkt. 48, Exh. A]. The Offer Letter explicitly the stated "essential terms" of the parties' agreement, such as Plaintiff's job position and compensation comprised of base salary and the Incentive Plan. [*Id.*]. Plaintiff accepted this offer when he signed the Offer Letter on February 24, 2014 and commenced employment pursuant to the terms of the Offer Letter. [*Id.*; *see also* Def's Resp. to Pl's SUMF, Dkt. 55 ¶ 4]. *See Weichert Co. Realtors*, 608 A.2d at 284 ("An offeree may manifest assent to the terms of an offer through words … or by conduct."). The parties do not dispute that Plaintiff worked for Pinnacle as an OTP developer until his October 2017 termination, or that he received a base salary consistent with the Offer Letter and, later, the modified compensation plans.

While Defendant does not contest these facts, Defendant argues that no contract existed because the Offer Letter was merely an offer, and not an enforceable contract. But "[o]ffer letters may be found to create a contract or contractual obligations," including the obligation to pay incentive bonuses. *Pease v. Techs.*, No. CV 15-3586, 2016 WL 705240, at *3 (E.D. Pa. Feb. 23, 2016) (collecting cases); *see also Harlan v. Packaging Corp. of Am.*, No.

CV1600077RBKKMW, 2017 WL 3894965, at *5, *7 (D.N.J. Sept. 6, 2017) (finding an express employment contract where plaintiff signed an offer letter). Thus, the mere fact that an offer letter, rather than a formal employment agreement, described the essential terms of the Plaintiff's employment does not mean that the Parties did not enter into a contract.

Defendant also argues that disclaimer language in the Offer Letter precludes an enforceable contract. To support this argument, Defendant cites selectively from the following provision in the Offer Letter:

> **<u>Employment is At Will</u>**
>
> Although we hope your employment with us is mutually satisfactory, your employment with Pinnacle Treatment Centers is "at will" … **Neither this letter nor any communication, either written or oral, should be construed as a contract of employment**, unless it's signed by both you and a principal of Pinnacle Treatment Centers and such agreement is expressly acknowledged as an employment contract. Similarly, the compensation and benefits, including salary, commission plans, bonus plans, etc., **are subject to the sole discretion of Pinnacle Treatment Centers** and may be changed at any time.

[Dkt. 48, Exh. A; *see also* Def's Mot. Summ. J., Dkt. 56-1 at 9] (emphasis added).

This Court and courts elsewhere have previously held that similar disclaimer language located in an "employment at will" section of an employment contract applies only to an employee's status as an at-will employee, and not to other terms and conditions of employment. *See, e.g.*, *Overton v. Sanofi-Aventis U.S., LLC*, No. CIV.A. 13-5535 PGS, 2014 WL 5410653, at *6 (D.N.J. Oct. 23, 2014) (holding that similar disclaimer language in an employee handbook "does not mean that the document does not constitute a contract; it merely means that it is not an employment contract altering the at-will employment relationship between the parties"); *Divenuta v. Bilcare, Inc.*, No. CIV.A. 09-3657, 2011 WL 1196703, at *1, *3 (E.D. Pa. Mar. 30, 2011) (holding that an employment offer letter stating that this "letter does not constitute either

an employment contract or a guarantee of employment for a specified period of time" established an at-will employment contract).

The Court here agrees and finds that the above-referenced disclaimer language in the Offer Letter only states that Plaintiff would serve as an at-will employee at Pinnacle. Because Plaintiff does not argue that his employment contract with Pinnacle entitled him to a specific term of employment or stated that he could only be terminated for cause, this disclaimer language has no bearing on Plaintiff's breach of contract claim. *See McGough v. Broadwing Commc'ns, Inc.*, 177 F. Supp. 2d 289, 296 (D.N.J. 2001) (stating that an at-will employment contract provision "does not … address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination"). Thus, this disclaimer does not defeat Plaintiff's valid employment contract.

Defendant similarly argues that the Offer Letter's provision that Plaintiff's compensation and bonuses "are subject to the sole discretion of Pinnacle Treatment Centers" precludes a contract between the parties. [Dkt. 56-1 at 9]. The Court finds this argument to be unpersuasive. This discretionary provision in the Offer Letter only means that Pinnacle could alter an essential term of the contract—Plaintiff's compensation—at some future date; it does not mean that the parties did not mutually assent to an essential term of the contract. *See Pease*, 2016 WL 705240, at *3 (finding that an offer letter containing similar discretionary language established an enforceable contract); *Divenuta*, 2016 WL 705240, at *3 (same).

The 2015 and 2017 modifications to Plaintiff's compensation scheme do not render the parties' contract invalid. "It is well accepted that a contract may be modified by mutual assent, which can be shown 'by an explicit agreement to modify, or ... by the actions and conduct of the

parties, so long as the intention to modify is mutual and clear.'" *Soranno v. Heartland Payment Sys.*, LLC, No. CV1816218FLWLHG, 2020 WL 5652469, at *9 n.14 (D.N.J. Sept. 23, 2020) (quoting *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 322 (3d Cir. 2006)) (alteration in original).

Both parties agree, and the evidence shows, that the Parties explicitly agreed to modify Plaintiff's salary in January 2015 and January 2017, and continued their employer-employee relationship under these modified terms. [Dkt. 48, Exhs. B & C]. The parties also agree and the evidence shows that the parties assented in writing to replace the Incentive Plan with the Second Incentive Plan in January 2015.[4] [Def's Resp. to Pl's SUMF, Dkt. 55 ¶ 6]. Plaintiff has also provided bank statements showing that he received payments from Pinnacle in 2015, 2016, and 2017 in amounts consistent with the Incentive Plan and Second Incentive Plan, and declared that such payments were incentive bonuses received for clinics not at issue here. [*See* Pl's Decl., Dkt. 57 ¶ 12 and Exh. A thereto]. Defendant does not argue or offer evidence to show that Defendant did not pay bonuses to Plaintiff consistent with the Incentive Plan or Second Incentive Plan. Because the Parties "assented" to these modifications in writing and in action, they do not alter the Court's conclusion that Plaintiff's employment contract is enforceable. *Soranno*, 2020 WL 5652469 at *9.

In sum, the Offer Letter and Plaintiff's acceptance thereof established an enforceable employment contract between Plaintiff and Pinnacle, whereby Plaintiff would work as an at-will OTP developer, and earn $60,000 per year with the possibility of earning $75,000 for each

---

[4] Without explanation, Defendant denies that the Second Incentive Plan continued to apply when Pinnacle increased Plaintiff's salary in January 2017. [Def's Resp. to Pl's SUMF, Dkt. 55 ¶ 6]. Presumably, Defendant objects because the email correspondence notifying Plaintiff of his salary increase did not mention performance incentives at all. [*See* Dkt. 48, Exh. C]. But because the parties explicitly and mutually agreed to establish the Second Incentive Plan, changing or doing away with the Second Incentive Plan would require another modification. Defendant has not offered any evidence of an explicit agreement or conduct to show that the parties intended to modify the Second Incentive Plan. *Soranno*, 2020 WL 5652469, at *9.

Pinnacle clinic that he "opened" and that attained 100 clients. Plaintiff's compensation was modified in January 2015, such that Plaintiff's base salary increased to $100,000 and he received bonuses under the Second Incentive Plan. [Def's SUMF, Dkt. 56-2 ¶ 7; Pl's SUMF, Dkt. 48-11 ¶¶ 6–10]. In January 2017, Pinnacle increased Plaintiff's base salary to $110,000, but the Second Incentive Plan remained unchanged. [Dkt. 48-11, Pl's SUMF ¶¶ 11–13; Dkt. 56-2, Def's SUMF at ¶ 8].

**ii. The Contract is Ambiguous**

Having found that an enforceable contract exists, the next is to determine "'whether the contract is ambiguous concerning the dispute between the parties.'" *United States v. Pantelidis*, 335 F.3d 226, 235 (3d Cir. 2003) (quoting Sumitomo *Machinery Corp. of America, Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996)). "In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.*, 'subject to only one reasonable interpretation.'" *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)). "The Court determines whether a contract or contract terms is ambiguous." *Consol. Rail Corp. v. Ferro Corp.*, No. CV 03-717, 2005 WL 8176015, at *5 (D.N.J. Apr. 14, 2005) (collecting cases).

When assessing a contract's ambiguity under New Jersey Law, a court "must always 'consider all of the relevant evidence that will assist in determining the intent and meaning of the contract.'" *Mylan*, 723 F.3d at 418. Such evidence may include "'the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'" *Id.* (quoting *Kearny PBA Local No. 21 v. Town of Kearny*, 81 N.J. 208, 405 A.2d

393, 400 (1979)). A court must also consider the plain meaning of the contract terms when determining whether an ambiguity exists. *See Consol. Rail Corp.*, 2005 WL 8176015, at *5 ("A contract term which is unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently.").

The parties' dispute as to whether Plaintiff is entitled to incentive payments under the employment contract results from an ambiguity in the Offer Letter's varied use of the term "open" and Plaintiff's job responsibilities. The relevant language from the initial 2014 Offer Letter states

> You will be entitled to earn an incentive **for opening** an OTP clinic and meeting the 100 initial client enrollment. The total incentive you can earn is $75,000 per clinic **you open**. Fifty percent (50%) or $37,500 of the incentive will be given **upon opening** of the clinic and **fifty percent (50%) or $37,500 will be due once the clinic reaches 100 clients.**

[Dkt. 48, Exh. A] (emphasis added). The January 2015 email describing the Second Incentive Plan stated that Plaintiff would receive $12,500 "upon opening" of each new clinic and $12,500 "at 100 census," for a possible bonus of $25,000 per clinic (the "Second Incentive Plan"). [Dkt. 48, Exh. B].

These communications are ambiguous as to both the Opening Incentive and the Enrollment Incentive. With respect to the Opening Incentive, the communications do not define what it means to "open" a Pinnacle clinic. Further, the inconsistent use of the term "open" obscures the Plaintiff's obligations under the Incentive Plan. The phrases "for opening" and "you open" suggest that Plaintiff himself was required to personally "open" each clinic, even as the contract does not describe the tasks required to "open" a clinic. "Upon opening," however, suggests that Plaintiff would receive compensation for past efforts if and when a clinic opened.

The parties' dispute thus hinges, in part, on whether Plaintiff's employment contract entitled him to Opening Incentive payments (1) when he himself "opened" a clinic, or (2) "upon [a clinic's eventual] opening" after Plaintiff fulfilled his own responsibilities.[5] If (1), there is a separate question as to whether it was Plaintiff's responsibility to take the steps necessary to "open" a clinic.

A similar ambiguity exists regarding the Enrollment Incentive. The relevant language from the Offer Letter states that "fifty percent (50%) or $37,500 will be due once the clinic reaches 100 clients." [Dkt. 48, Exh. A]. These communications do not indicate whether Plaintiff must have personally opened the clinics in accordance with scenario (1) above in order to earn the Enrollment Incentive, or whether he could receive the Enrollment Incentive after scouting a clinic location that eventually enrolled 100 clients even if he did not personally "open" the clinic. Nor does the Offer Letter or any other communication explain whether Plaintiff was required to contribute to Pinnacle's efforts to enroll 100 clients.

The record evidence does not conclusively resolve these ambiguities in favor of one party or the other. Plaintiff has offered pay stubs showing payments from Pinnacle in amounts consistent with the Incentive Plan and Second Incentive Plan, and a declaration identifying the clinics to which these payments correspond. [Def's Mot. Summ. J., Dkt. 57-1 and Exh. A thereto]. Even if this evidence proves that Plaintiff received incentive payments in the past, it does not prove that he earned these payments after merely obtaining certificates of occupancy for these clinics. Plaintiff also offers his own deposition testimony that he was only responsible for

[5] Under New Jersey law, an employee who satisfies the conditions necessary to earn incentive bonus payments before being terminated is entitled to those payments after he is terminated, unless the employment contract contains language to the contrary. *See Sluka v. Landau Uniforms, Inc.*, 383 F. Supp. 2d 649, 655–56 (D.N.J. 2005). If a jury finds that Plaintiff performed the work necessary to earn incentive bonus payments under his employment contract, then Plaintiff is entitled to compensation for the Seven Clinics, even if the clinics did not open or attain 100 clients until after he was terminated.

working until certificates of occupancy issued, and that he obtained certificates of occupancy for the Seven Clinics. [Pl's Mot. Summ. J., Dkt. 48 at 9–10 and Exh. E thereto]. But it is the jury's role to weigh the credibility of Plaintiff's testimony. *Big Apple BMW, Inc.*, 974 F.2d 1358 at 1363.

The evidence also does not prove Defendant's interpretation of the Offer Letter, whereby Plaintiff was required to "open" the clinics. Defendant points to Plaintiff's testimony that Plaintiff was "charged with getting the [Certificate of Occupancy] taking it to that point. That means it's ready to open. And the operation team comes into the clinic and does everything from that point." [Pl's Mot. Summ. J, Dkt. 48, Exh. D at 59:23–60:2; *see also id.* at 23:5–15]. As Defendant points out, there is a distinction between a clinic being "ready to open" and a clinic being "open," [Def's Mot. Summ. J., Dkt. 56-1, at 6], a distinction which the plain meaning of the word open supports. *See Open*, Merriam Webster, https://www.merriam-webster.com/dictionary/open (last visited Jan. 22, 2021) ("Being in operation"). However, Defendant does not dispute Plaintiff's description of his job responsibilities, argue that Plaintiff failed to complete any of these tasks, or affirmatively state which additional tasks Plaintiff needed to complete to "open" a clinic. [*See* Def's SUMF, Dkt 56-1 ¶¶ 10–13]. In other words, Defendant contends that Plaintiff is not entitled to Opening Incentive payments because he did not "open" the Seven Clinics, but does not argue or offer evidence that Plaintiff was obligated under the contract to complete additional clinics to "open" the Seven Clinics. Defendant also does not argue or offer evidence that Plaintiff needed to actively recruit clients in order to earn the Enrollment Bonus.

Ultimately, the record lacks evidence necessary to interpret the parties' ambiguous contract. Neither party has conclusively shown where Plaintiff's obligations with respect to

"opening" a Pinnacle clinic began and ended. Further, neither party has conclusively shown that Plaintiff did or did not receive previous incentive payments after obtaining certificates of occupancy and without completing any additional work. The Incentive Plan provision of Plaintiff's employment contract is therefore open to multiple interpretations. A jury—not the Court—must weigh the evidence to decide which interpretation is correct. *See Mylan*, 723 F.3d at 418.

A jury is entitled to consider whether Defendant breached the contract and whether Plaintiff is entitled to Opening Incentives and Enrollment Incentives for all of the Seven Clinics. As discussed above, Defendant has challenged the evidentiary basis for Plaintiff's claim that the Pinnacle clinic in Vineland, New Jersey opened. [Def's Resp. to Pl's SUMF, Dkt. 55 ¶¶ 22, 24]. Specifically, Defendant alleges that Plaintiff relied on an inadmissible newspaper article discussing the Vineland Clinic's opening as evidence that the Vineland clinic opened, [Def's Resp. to Pl's SUMF, Dkt. 55 ¶¶ 22], and has not otherwise presented admissible evidence of the Vineland clinic's opening or enrollment numbers.

The Court agrees it cannot consider this newspaper article because it is inadmissible hearsay. The article is an out-of-court statement made by a non-party reporter regarding the Vineland facility's opening, which Plaintiff has used to prove that the Vineland facility opened. *See* Fed. R. Evid. 801(c). Because this article does not meet any of the hearsay exceptions enumerated in Rule of Evidence 803, the Court cannot consider this article for the purposes of summary judgment. *See Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 995–96 (E.D. Pa. 1997) (refusing to consider newspaper article at summary judgment on hearsay grounds).

However, Defendant represented that the Vineland clinic opened in April 2019, [Dkt. 56-1 at 10] suggesting there is no dispute as to whether the Vineland clinic ever opened. Further, Plaintiff has offered evidence of a certificate of occupancy for the Vineland clinic. [Dkt. 48 ¶, Exh. E]. Considering this evidence in a light most favorable to Plaintiff as the Court must when determining whether to grant Defendant's motion as to the Vineland clinic, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and in light of the contract's ambiguity, the Court finds that a jury is entitled to consider whether Plaintiff may recover as to the Vineland clinic.

As discussed above, Defendant argues that no contract existed between the parties because of language in the "Employment At Will" section of the Offer Letter which states that "the compensation and benefits, including salary, commission plans, bonus plans, etc., are subject to the sole discretion of Pinnacle Treatment Centers and may be changed at any time." [Def's Mot. Summ. J., Dkt. 56-1 at 9]. Defendant also points to language in the Offer Letter which states that "[t]he incentive must be approved by CEO." [Def's Response to Pl's SUMF, Dkt. 55 ¶¶ 16–20]. To the extent that Defendant's reliance on this language can be construed as an argument that Defendant did not breach the contract by refusing to pay Plaintiff under the incentive plan because such payments were discretionary, this argument fails because this language regarding "discretion" and "CEO approval" is also ambiguous.

In *Divenuta v. Bilcare, Inc.*, the court denied a defendant's motion for summary judgment after finding similar language in an offer letter to be ambiguous. 2016 WL 705240, at *3. In that case, the employee plaintiff sought to recover unpaid incentives from his former employer. The offer letter which described the plaintiff's incentive compensation scheme stated that such incentives were "subject to the sole and complete discretion of management." *Divenuta*, 2011 WL 1196703, at *6. The court found that the offer letter established an enforceable contract, but

that this incentive provision was ambiguous. *Id.* The court noted that this language could be interpreted to mean either that the existence of incentive payment plans were subject to management's discretion, or that incentive payment amounts were subject to management discretion but that the plaintiff was nevertheless entitled to incentive payments so long as he satisfied the necessary requirements. *Id.* Due to this ambiguity, the court denied defendant's summary judgment motion. *Id.* at *7.

The Court agrees with *Divenuta*'s contract analysis and reasoning, and finds that the language in Plaintiff's Offer Letter stating that incentive payments were "subject to the sole discretion of Pinnacle Treatment Centers" to be ambiguous. As in *Divenuta*, the language stating that Plaintiff's compensation was discretionary could mean that individual incentive payments, individual payment amounts, and/or the entire incentive scheme was subject to management's discretion. Pinnacle exercised this discretion in 2015 and 2017 to adjust Plaintiff's base salary and incentives, as discussed above. It is not clear, however, that this same language permits Defendant to eliminate Plaintiff's incentive payments altogether, and to do so after Plaintiff already completed the work required to earn incentive payments.

Likewise, the Offer Letter's requirement that the CEO approve any incentive could be interpreted in several ways. It could mean that the CEO had to approve the incentive payment amount, or confirm that Plaintiff fulfilled his obligations before granting incentive payments. It might also mean that the CEO could unilaterally withhold incentive payments even if Plaintiff fulfilled his obligations. The evidence suggests that Plaintiff had previously received incentive payments consistent with the Incentive Plan and Second Incentive Plan. [Pl's Decl., Dkt. 57 ¶ 12]. But that evidence does not demonstrate whether or to what extent the CEO "approved" these payments, or whether the CEO previously withheld other payments. In other words, that

evidence does not establish a conclusive or unambiguous interpretation of the Offer Letter's "CEO approval" language.

In sum, the Court finds that ambiguity permeates the Offer Letter that contained the essential terms of the express contract between the parties. Due to this ambiguity, the Court cannot decide the parties' contract dispute. *See Mylan*, 723 F.3d at 418. The Court therefore denies both Parties' Motion for Summary Judgment as to Plaintiff's breach of contract claim (Count VII).

**b. Unjust Enrichment (Count V)**

"Recovery for unjust enrichment … is an equitable remedy that is only available when there is no express contract providing for remuneration." *Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, No. CIV.A. 11-1279 MLC, 2011 WL 3022243, at *8 (D.N.J. July 22, 2011) (citing *Caputo v. Nice–Pak Prods.*, 693 A.2d 494 (N.J. Super Ct. App. Div. 1997)). In his Motion for Summary Judgment, Plaintiff concedes that he cannot recover on his unjust enrichment theory if the Court finds that an enforceable contract exists between the parties. [Pl's Mot. Summ. J., Dkt. 48-1 at 16]. Because the Court has found that the parties entered into an express contract, and because Plaintiff seeks damages pursuant to this contract, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's unjust enrichment claim.

**c. Quantum Meruit (Count VI)**

Under the quasi-contractual doctrine of quantum meruit, Courts may permit a party to "recoup the reasonable value of services rendered" where the party has "confer[red] a benefit with a reasonable expectation of payment" but has not received any such payment. *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) (citations and quotations omitted). As with unjust enrichment, a party cannot recover under a quantum meruit theory where a valid contract

exists. *New York-Connecticut Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 159 A.3d 892, 901 (N.J. Super. Ct. App. Div. 2017) ("'[T]he existence of an express contract excludes the awarding of relief regarding the same subject matter based on quantum meruit.'" (quoting *Kas Oriental Rugs v. Ellman*, 926 A.2d 387 (N.J. Super. Ct. App. Div. 2007))).

Here too, because the Court finds that a valid contract existed between the parties, and because the valid contract precludes recovery under quantum meruit, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's unjust enrichment claim.

## IV. Conclusion

For the reasons set forth above, both parties' motions for summary judgment as to Plaintiff's breach of contract (Count VII) are hereby denied. Defendant's motion for summary judgment as to Plaintiff's claim for unjust enrichment (Count V) and quantum meruit (Count VI) is hereby granted. An appropriate order will follow.

Dated: February 16, 2021

/s/ Joseph H. Rodriguez

JOSEPH H. RODRIGUEZ, USDJ